UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
PROVIDENCE ZUMBO, as Administratrix of the
Estate of JOHN ZUMBO a/k/a JOHN D. ZUMBO,    **CIV. NO. 07 CV 6340 (LMM)**

Plaintiff,

-against-

T. AND B. EQUIPMENT COMPANY, INC.,
ALLEN GEORGE ROTHENBERGER,

Defendants.
-------------------------------------------------------------------X


# EXHIBIT "E"


## TO


## DECLARATION IN SUPPORT OF
## PLAINTIFF'S IN LIMINE
## MOTION

1                          M. Kelly

2      operations staff, helping them with planning

3      and material acquisition.  It's a hard job

4      description because it's a little bit of

5      everything, if that makes any sense.

6           Q.      Where is your office located?

7           A.      We're at 11065 Leadbetter Road and

8      that's Ashland, Virginia 23005.

9           Q.      Does the company have other offices?

10          A.      We have storage yards in Orlando,

11     Florida and Goodyear, Arizona.  Goodyear is a

12     suburb of Phoenix.

13          Q.      When you say storage yards, you mean

14     for trucks or materials?

15          A.      Scaffolding equipment.  We have a

16     few employees there to load and unload trucks.

17          Q.      How many employees at T. and B., do

18     you know?

19          A.      Currently we have 210.

20          Q.      And how many are located at the

21     Ashland location?

22          A.      150 of them are based out of Ashland.

23     We have work crews all over the country but

24     approximately 150 of them are based out of

25     Ashland.  Then the balance is pretty evenly

LASER BOND FORM B    ®    PENGAD · 1-800-631-6989 · www.pengad.com

12

1           M. Kelly

2      Q.    Does he organize the groups of loaders

3  who load and unload the trucks?

4      A.    Yes, and the staff that's on-site to

5  set up the equipment.  He has a few people under

6  him.

7           Then we have Shannon Sirles who is in

8  charge of our CAD department and systems.

9      Q.    C-A-D?

10     A.    C-A-D, yes.

11     Q.    And what is that?

12     A.    Computer aided design.  We have to do

13  engineer drawings of the structures we put up.

14     Q.    In other words, if you have to set

15  up a set of bleachers at a golf course, you do

16  a computer-generated design?

17     A.    Yes.

18     Q.    Okay.  And is Ms. Sirles in charge

19  of that unit, does she work by herself?

20     A.    Shannon is a he.

21     Q.    Sorry.

22     A.    Easy mistake.

23           Yes, he is in charge of the CAD staff.

24  Currently there are two individuals under him.

25  He's also responsible for information systems,

13

1                          M. Kelly

2      the computer department.  I say computer

3      department, it's just him and one other person.

4           Q.     Do you have a CPA?

5           A.     Yes, I passed the exam but I'm

6      currently not -- my license is not active.

7           Q.     Do you have any other certificates --

8           A.     No.

9           Q.     -- for your job?

10          A.     No.

11          Q.     Do you have a commercial driver's

12     license?

13          A.     No.

14          Q.     And have you ever driven for

15     T. and B.?

16          A.     No.

17          Q.     Any other companies?

18          A.     No.

19          Q.     Describe for me the trucking unit,

20     if I can describe it like that, of T. and B.

21          A.     Okay.  We have four road tractors on

22     the road and eight trailers.  We use those

23     primarily to shift equipment from one job site

24     to another.  I would say 99.9 percent of our

25     shipping is done via common carrier.  These

14

1                          M. Kelly

2      trucks are really used to just shift equipment

3      from one job site to another.

4          Q.     Who's the common carrier?

5          A.     Oh, that's -- there's hundreds of

6      different ones.  We go through, we go through

7      brokers and they line up the actual carrier.

8          Q.     Now, you use a broker to set up the

9      carrier?

10         A.     Yes.

11         Q.     So how do you do that, is that on a

12     job-by-job basis?

13         A.     As needed.

14         Q.     Is there someone who's in charge of

15     making those arrangements with the broker?

16         A.     That would be our operations

17     manager, Nathan Hughes.

18         Q.     And you mentioned before you have

19     four road tractors.  Can you describe what you

20     mean by road tractor?

21         A.     Tractor-trailer.

22         Q.     Is that just the cab itself?

23         A.     Well, the road tractor is the cab

24     unit itself.

25         Q.     And then the trailer is the actual

15

M. Kelly

1
2  flatbed that carries the equipment?

3      A.     Yes.

4      Q.     And you have eight of those?

5      A.     Yes.

6      Q.     Are they stored in any one location?

7      A.     No, they -- typically there're two

8  in Richmond, one in Florida and one in Phoenix.

9      Q.     How many drivers do you have at

10  T. and B., truck drivers?

11      A.     CDL drivers there's six.

12      Q.     Could you possibly name them?

13      A.     Allen Rothenberger obviously, Claude

14  Terrell, let's see, Patrick Myrick, Bob Coe,

15  Bob Mcara, and Bob Mcara is part time, and Lou

16  Wodash.

17      Q.     Lou?

18      A.     Wodash, W-o-d-a-s-h.  Those are the

19  current drivers.

20      Q.     Is Mr. Rothenberger the senior most

21  driver of the company?

22      A.     No, Claude Terrell would be.

23      Q.     Is Allen Rothenberger the next

24  senior most?

25      A.     Allen is -- no, he's going to be

16

<pre>
 1                    M. Kelly
 2   number three on that list.  Bob Coe, actually,
 3   I take that back, Bob Coe is senior, Claude is
 4   second and then Allen.
 5        Q.    How long has Bob Coe been there?
 6        A.    Since January of '02.
 7        Q.    Mr. Terrell?
 8        A.    It was sometime in 2003.  I don't
 9   know the exact date.
10        Q.    And Mr. Rothenberger?
11        A.    Allen, I don't know his exact date
12   of hire.  I'd have to look that up.
13        Q.    Has T. and B. always had their own
14   drivers?
15        A.    Yes.
16        Q.    Has there been a time when their
17   numbers have changed in terms of you now have
18   six, was there a time when you had less than
19   six or more than six?
20        A.    Yes, less.  This is the most we've
21   ever had.
22        Q.    And when was the last time that you
23   had less?
24        A.    Let's see, in '06 there were four.
25   I'd say going back to probably 2000 -- pre-2002
</pre>

17

1       M. Kelly

2   there were typically just two.

3       Q.      Why does T. and B. have their own

4   drivers as opposed to using outside trucking

5   companies?

6       A.      There are times, depending on I

7   guess the trucking market, there's some places

8   it's difficult to get a common carrier to go

9   into; and we may have a time sensitive shipment,

10  we'll send one of our own trucks; or, and this

11  is mainly what we use our drivers for, when we

12  have two jobs fairly close together, within 100

13  or 150 miles, it's more beneficial for us to

14  use our own driver to just move that equipment

15  between those two jobs than to hire a common

16  carrier.

17      Q.      Now, the full-time truck drivers, do

18  they receive benefits?

19      A.      Yes.

20      Q.      Health benefits?

21      A.      Health insurance, dental and life.

22      Q.      Mr. Rothenberger, do you know what

23  his salary is, yearly salary is?

24      A.      That will vary because he's paid per

25  mile and then he has part of his compensation

21

1                    M. Kelly

2       Q.      Are the individuals you named before

3   on your organizational chart, Mr. Ellis, yourself,

4   Nathan Hughes and Mr. Sirles, are any of them

5   shareholders in the corporation?

6       A.      Burke Ellis owns 51 percent of the

7   company.  Shannon Sirles' wife who owns

8   49 percent, she's the sister of Burke Ellis.

9       Q.      Do you know what the annual revenues

10  for T. and B. are?

11      A.      Currently this year $25 million.

12      Q.      Could you describe the actual work

13  that T. and B. does?

14      A.      Yes.  We provide temporary seating,

15  skyboxes, tent floors and camera towers primarily

16  to sporting events.  Approximately three-quarters

17  of our work is done for the professional golf

18  tours.

19      Q.      Is it just within the United States

20  or is it --

21      A.      Just the U.S.

22      Q.      Is there a particular portion of the

23  U.S. or is it the entire domestic area?

24      A.      The entire 48 plus Hawaii.

25      Q.      Do you go into Mexico at all?

24

1               M. Kelly

2       A.      No, we have not conducted previous

3   employment checks on drivers.

4       Q.      Okay.  You mentioned before that you

5   were also -- you served in the human resources

6   function?

7       A.      Yes.

8       Q.      Can you describe what you mean by

9   that.

10      A.      In human resources I include I mean

11  benefits administration, I'm the plan

12  administrator on the 401(k) plan, the plan

13  administrator on the health insurance plan,

14  those functions.

15      Q.      Does anyone serve as a safety

16  director for the company?

17      A.      No.

18      Q.      Are you familiar with the Federal

19  Motor Carrier Safety Regulations?

20      A.      A little.

21      Q.      How did you become familiar with

22  them?

23      A.      I'm not sure how to answer this

24  question.  Going onto the motor carrier Website

25  to do research if a specific question arose

25

                               M. Kelly

1

2    about something.  I have not studied the

3    regulations.  I do not know the regulations.

4        Q.    Does anyone at T. and B. know the

5    regulations?

6        A.    Not all of the regulations.

7        Q.    Has anyone at T. and B. studied the

8    regulations?

9        A.    Not all of the regulations.

10       Q.    I'm going to abbreviate Federal

11   Motor Carrier Safety Regulations as FMCSR.  If

12   I do so, would you know what I'm talking about?

13       A.    Yes.

14             MR. TUCKER:  Any objection to that?

15             MR. HORAN:  You mean in your

16       questions?

17             MR. TUCKER:  In my questions.

18             MR. HORAN:  No.

19       Q.    Are you aware that the purpose of

20   the FMCSR is to promote safety of operations on

21   the nation's highways for the general driving

22   public?

23       A.    Yes.

24       Q.    Was there any safety training provided

25   to Mr. Rothenberger when he became employed

LASER BOND FORM B ® PENGAD • 1-800-631-6989 • www.pengad.com

26

1          M. Kelly

2    with T. and B.?

3          A.    There is a training brochure for

4    flatbed haulers that our drivers are given and

5    they're asked to read and there's a page in

6    front of the booklet saying that I read and

7    understand these regulations and procedures.

8              THE WITNESS:  I sent that booklet up.

9              MR. HORAN:  Thank you.

10             (Kelly Exhibit 1, Booklet, marked

11        for identification, as of this date.)

12         Q.    Mr. Kelly, I've handed you a document

13    we've marked as Kelly 1.  Do you recognize that

14    document?

15         A.    Yes.

16         Q.    And what is that document?

17         A.    That is the book that I just spoke

18    of that I asked the drivers to read and

19    understand about hauling flatbed loads.

20         Q.    Are you familiar with this booklet?

21         A.    A little.  I have not read it.

22         Q.    Okay.  Do you need a moment to take

23    a look through it before I ask you some

24    questions about it?

25         A.    Well, let's just -- let's ask the

27

M. Kelly

1      questions.

3      Q.      Okay.  Is this the entirety of any

4      safety manual provided to Mr. Rothenberger

5      subsequent to his employment with T. and B.?

6      A.      No, there is an employee handbook

7      that addresses driving that he would have

8      received at the time of hire.

9      Q.      I'm going to hand you a document

10     that has been marked as Plaintiff's 1.  Is that

11     the employees handbook?

12     A.      There's an older version that I'm

13     thinking of and not this particular document.

14     Q.      Does T. and B. still have that older

15     version --

16     A.      Yes.

17     Q.      -- in its custody and control?

18     A.      Yes.

19     MR. TUCKER:  Okay.  I'd ask for

20     production of that, John.

21     MR. HORAN:  No problem.

22     MR. TUCKER:  And I'll put it in

23     writing for you also.

24     MR. HORAN:  No problem.  I don't

25     want to -- yes, please follow it up in

28

1                           M. Kelly

2          writing and that should be no problem if

3          he has it.

4          Q.      The older version, how is it

5     different than this version?

6               MR. HORAN:   If you know without

7          looking at the other one.

8          A.      It's basically the same.  I know

9     that it does address operating company vehicles.

10    It's basic, they're to be used for company

11    business only, there's to be no alcohol or drug

12    abuse while operating a vehicle.  It's a very

13    basic document.

14         Q.      Does it address the requirements

15    under the FMCSR?

16         A.      No.

17         Q.      Who developed that booklet, do you

18    know?

19         A.      I don't know who wrote it.  It was

20    before my time.

21         Q.      Do you know who developed the

22    document which I've showed you Plaintiff's

23    Exhibit 1?

24         A.      This one is basically excerpts from

25    the document I speak of and then Nathan Hughes,

29

M. Kelly

1     M. Kelly

2  our operations manager, wrote that.

3       Q.    So there is no safety plan at

4  T. and B. for the drivers?

5       A.    No formal safety plan.

6       Q.    What efforts has the company made in

7  relation to safety instructions for the drivers

8  at T. and B.?

9             MR. HORAN:  At what time?

10            MR. TUCKER:  Let's say at the time

11       that Mr. Rothenberger was hired up to and

12       about July of 2006.

13            MR. HORAN:  I'm sorry, could I have

14       the question read back.

15            (Record read.)

16            MR. HORAN:  Just note my objection.

17            Could you just clarify what do you

18       mean by efforts made.

19            MR. TUCKER:  Okay.

20       Q.    Has the company provided any classes

21  for any of the drivers --

22       A.    No.

23       Q.    -- during that period of time?

24       A.    No.

25       Q.    Did the company hire any outside

30

1              M. Kelly

2    safety consultants to speak with the drivers?

3        A.     No.

4        Q.     Did the company send the drivers to

5    any classes outside of T. and B. for safety

6    instructions?

7        A.     No.

8        Q.     Did the company send any of the

9    drivers on accident prevention workshops?

10       A.     No.

11       Q.     Did the company provide any accident

12   prevention workshops?

13       A.     No.

14       Q.     With regard to the drivers, what

15   industry standards did the company adopt?

16       A.     I'm sorry, say that last part again.

17       Q.     Are you familiar with the industry

18   standards as they relate to commercial driving,

19   commercial drivers?

20       A.     No.

21       Q.     Does anyone at T. and B. know what

22   they are?

23              MR. HORAN:  If you know.

24       A.     I'd have to answer no, I don't know.

25       Q.     Does T. and B. offer any incentives

31

1                              M. Kelly

2    or bonuses to promote safe driving habits?

3          A.     No.

4          Q.     Has anyone at the company ever done

5    any research into safety programs outside the

6    company for the drivers?

7          A.     Yes.

8          Q.     Who was that?

9          A.     That would be me.

10         Q.     And when did you do that?

11         A.     In the last 12 months.

12         Q.     That's subsequent to the accident

13   with Mr. Zumbo?

14         A.     Yes.

15         Q.     But prior to that you've never --

16         A.     No.

17         Q.     Let me finish the question.

18         A.     Sorry.

19         Q.     Prior to that you never researched

20   any safety programs for the drivers?

21         A.     No.

22         Q.     And did anyone at T. and B. do that

23   prior to the accident?

24         A.     I don't know.

25                MR. HORAN:  Just note my objection

32

```
1                         M. Kelly
2        to any questions about procedures subsequent
3        to the accident.
4              MR. TUCKER:  Yes, that's really
5        informational stuff.  The objection is for
6        trial, I understand that.
7              MR. HORAN:  That's why I didn't tell
8        him not to answer.
9              MR. TUCKER:  Yes, good.  Thanks.
10       Q.      The drivers, the commercial drivers
11    that drive for T. and B. prior to the accident,
12    were they screened by anyone at T. and B.?
13             MR. HORAN:  What do you mean by
14       screened?
15       Q.      Were they screened for drug and
16    alcohol use?
17       A.      No.
18       Q.      Were they ever asked if they abused
19    alcohol?
20       A.      I don't know if that question was
21    asked.
22       Q.      Do you know if they were ever asked
23    if they abused drugs?
24       A.      I don't know if that question was
25    ever asked.
```

33

1                              M. Kelly

2          Q.      Did anyone at T. and B. ever take

3     any efforts to verify whether or not someone

4     was regularly using alcohol, CDL driver?

5          A.      I don't know.

6          Q.      But you were in charge of human

7     resources at the time?

8          A.      Yes, so to speak.

9          Q.      So you would be the person who would

10    know, right?

11         A.      Yes.

12                 MR. HORAN:   Objection.

13         Q.      And you don't know as you sit here?

14         A.      I don't know if anyone asked that

15    question.

16         Q.      Does T. and B. have any suggestion

17    boxes about potential safety problems for

18    drivers?

19         A.      No.

20         Q.      Do you ever conduct any interviews

21    with the drivers regarding any safety issues?

22         A.      Yes.

23         Q.      And when was that?

24         A.      It's at various times.

25         Q.      Prior to the accident?

34

1                          M. Kelly

2       A.      Yes.

3       Q.      Okay.  Can you describe them?

4       A.      If, for example, if there was an

5    incident, maybe a piece of equipment fell off

6    the truck while it was going down the highway,

7    a strap will break from time to time, we'll ask

8    the driver what happened, why did that strap

9    break, was it damaged beforehand, trying to get

10   to the bottom of that, making sure that the

11   damaged strap has been disposed of and replaced

12   with a new one, that kind of thing.

13      Q.      Okay.  So most of those interviews

14   occurred after something occurred?

15      A.      Yes.

16      Q.      Did you ever sit down on a regular

17   basis and ask truckers what their concerns

18   might be with regard to safety?

19      A.      I have not.

20      Q.      Anybody at T. and B., to your

21   knowledge?

22      A.      I do not know the answer to that.

23      Q.      Was there an accident procedure in

24   place at T. and B. on the date of and before

25   the accident in question July of 2006?

35

1                    M. Kelly

2       A.      Yes.

3       Q.      And what was that procedure?

4       A.      Once an incident occurred, and this

5   would typically be myself or Nathan Hughes,

6   would contact the persons involved, take down

7   the details of the accident, if there were a

8   police report issued, insurance information

9   from another party if another party was

10  involved, gathering that information.

11             If it was something that needed to

12  be reported to our insurance carrier, that

13  information was reported by myself to the

14  insurance carrier.

15      Q.      And is that the sum total of the

16  review conducted by T. and B. after an

17  accident?

18      A.      Part of that process is to speak

19  with the parties involved trying to find out

20  why the accident or incident occurred and what

21  could have been done to prevent it, if anything.

22      Q.      So Nathan Hughes would be one person

23  that would sit down with the driver?

24      A.      Yes.

25      Q.      And how long would a typical interview

36

M. Kelly

1

2   be with Mr. Hughes following an accident?

3        A.     That would be a pretty short period

4   of time.

5        Q.     What do you mean by short?

6        A.     Ten, 15 minutes.

7        Q.     Between January of 2005 and July

8   of 2006, do you know how many accidents the

9   company trucks were involved in?

10              MR. HORAN:  What do you mean by

11        accident?

12              MR. TUCKER:  Any kind of accident,

13        whether it be a minor accident or a fatal

14        accident.

15              MR. HORAN:  Involving another vehicle?

16              MR. TUCKER:  Yes.

17        A.     One.  This one.

18        Q.     So is this the first time during that

19   period of time that Nathan Hughes had to sit

20   down with any driver to discuss what happened

21   with the accident?

22        A.     Over that course of time I'm sure

23   there were a couple of instances where a piece

24   of equipment may have come off a truck.  There

25   may have been --

37

M. Kelly

1

2          I can remember one specific incident

3    early in '07 -- I'm sorry, '06, where a motorist

4    called us who was traveling up the New Jersey

5    Turnpike and reported to us that something just

6    fell off of one of our trucks.

7          I immediately got the driver on the

8    phone.  At that time he had pulled over because

9    the motorist had flagged him down.

10          That's the only incident that comes

11   to mind right now and there was no property

12   damage or injury involved in that.

13      Q.    Was there any reason that prior to

14   July of 2006 T. and B. did not have a safety

15   director?

16      A.    I can't give you a reason.

17      Q.    In 2006, can you tell me what

18   T. And B.'s annual revenue was?

19      A.    Approximately 17 million.  I would

20   need to go back to my records to verify.

21      Q.    How about 2005?

22      A.    Maybe 13.  I'd have to go back and

23   look at numbers to give you exact numbers.

24      Q.    Okay.

25          MR. HORAN:  He just wants an

38

1                    M. Kelly

2      estimate at this point I think.

3          A.      I think that's about correct.

4          Q.      And you mentioned before that at

5      present it's approximately 25 million?

6          A.      Yes.

7          Q.      Was there any reason back in 2006

8      that T. and B. did not hire outside safety

9      consultants to instruct the drivers?

10         A.      No.

11         Q.      Was there any reason why in 2006

12     T. and B. didn't provide drivers with

13     instructions regarding the FMCSR?

14         A.      No.

15         Q.      Was there any reason why back in

16     2006 T. and B. did not provide its truck

17     drivers with any other safety manuals outside

18     of the documents that have been marked as

19     Plaintiff's 1 and Kelly 1?

20         A.      No.

21         Q.      And when I say Plaintiff's 1, I

22     refer to the --

23         A.      That other document.

24         Q.      The other document.

25         A.      I understand.

39

1                              M. Kelly

2        Q.      What is the reason that in the year

3    2006 T. and B. didn't provide any safety

4    instructions to its drivers?

5        A.      We are a small company.  The owner

6    of the -- the previous owner of the company had

7    just unexpectedly died.  Things were a little

8    topsy-turvy.  His son, Burke Ellis, had just

9    taken over as president.  It's a new role for

10   him.

11               I do not have an answer to your

12   question.

13       Q.      In 2005, who was the president of

14   the company?

15       A.      That was Burke Ellis.

16       Q.      I'm sorry, is that the son or the

17   father?

18       A.      That's the son.  The father passed

19   away in late '02.

20               MR. HORAN:  They had the same name?

21               THE WITNESS:  Yes, junior and senior.

22       Q.      So that Burke Ellis, Junior took over

23   in 2002?

24       A.      Yes.

25       Q.      And he was president in 2003?

40

1          M. Kelly

2      A.      Yes.

3      Q.      And he was president in 2004?

4      A.      Yes.

5      Q.      And he was president in 2005?

6      A.      Yes.

7      Q.      And he was president in 2006?

8      A.      Yes, sir.

9      Q.      Did he have any safety plan in

10    effect any of those years I just mentioned.

11    A.      No.

12    Q.      Were there any safety consultants

13    hired to instruct the drivers during any of

14    those years I just mentioned?

15    A.      To my knowledge, no.

16    Q.      Was there any safety director at

17    T. and B. during those years that we just

18    mentioned?

19    A.      No.

20    Q.      Is the main office for T. and B. in

21    Virginia?

22    A.      Yes.

23    Q.      I'm going to hand you two documents

24    that have been perviously marked as Plaintiff's

25    Exhibit 3 and Plaintiff's Exhibit 4 and tell me

41

1                          M. Kelly

2      if you recognize these documents.

3          A.     Yes.

4          Q.     Okay.  What do you recognize those

5      documents to be?

6          A.     These appear to be logbooks that

7      Allen Rothenberger completed, one in April, one

8      in June.

9          Q.     And are those logbooks records kept

10     in the regular course of business of T. and B.?

11         A.     Yes.

12         Q.     And they're kept by the drivers --

13         A.     Yes.

14         Q.     -- the truck drivers?

15         A.     Yes.

16                MR. HORAN:  Well, kept, what do you

17     mean kept?

18         Q.     Are they maintained by the driver?

19         A.     The driver completes the form and

20     then sends them in to the office.

21         Q.     Okay.  If we can look at Plaintiff's

22     Exhibit 3, for instance, the first page --

23     actually, each of the pages afterwards is a

24     similar copy of the driver's log just for a

25     different day, correct?

42

1                        M. Kelly

2         A.      Appears to be just different days,

3    yes.

4         Q.      So if we can just go over this. The

5    first day in Plaintiff's 3 on the first page is

6    April 7, 2006?

7         A.      Yes.

8         Q.      Okay.  And in the upper left-hand

9    corner there's a number 175; do you see that?

10        A.      Yes.

11        Q.      And what is that?

12        A.      That would be the truck number.

13        Q.      Okay.  The total miles driving today

14   is not filled out; is that fair to say?

15        A.      He didn't total it.  He has his trip

16   detail here by state and miles broken down by

17   state.

18        Q.      So that's in the lower left-hand

19   corner?

20        A.      Yes.

21        Q.      So is that under the quadrant named

22   miles driven today by states?

23        A.      Yes.

24        Q.      And, for instance, it says the state

25   Virginia --

43

1                    M. Kelly

2      A.      Yes.

3      Q.      -- it says empty?

4      A.      Yes.

5      Q.      And it looks like there's a number

6  there, I can't make it out, maybe 10?

7      A.      That would be impossible.  That number

8  should -- that should be 100.

9      Q.      Okay.

10     A.      Our office is located approximately

11  100 miles north of the North Carolina line.

12     Q.      So then if you go to the next line,

13  it says NC for North Carolina?

14     A.      Yes.

15     Q.      And it says empty 183?

16     A.      Yes.

17     Q.      So he was driving an empty trailer;

18  is that what that refers to?

19     A.      It appears from this logbook he was

20  taking an empty trailer to our Florida yard.

21     Q.      Okay.  If you look up on the top

22  half of the page, there's a graph.

23     A.      Bar graph.

24     Q.      There's a bar graph which indicates

25  several things that the driver has to keep a

44

1                    M. Kelly

2    record of.  The hours that he's off duty?

3         A.      Uh-huh.

4         Q.      The time that he or she is in the

5    sleeper berth?

6         A.      Uh-huh.

7         Q.      The time that they're driving and

8    the time that they're on duty, correct?

9         A.      Correct.

10        Q.      And they do that by charting the

11   number of hours along the bar graph?

12        A.      Yes, and these are in 15-minute

13   increments.

14        Q.      Now, the total's kept in far right

15   column under total hours, do you see that?

16        A.      Uh-huh.

17        Q.      Why does the driver fill out this

18   driver's daily log?

19        A.      He has certain hour requirements

20   that he has to maintain.

21        Q.      Is that company requirements?

22        A.      That is federal, federal requirement.

23        Q.      Under what statute, do you know?

24        A.      I do not know the section, specific

25   section offhand.

45

1                       M. Kelly

2       Q.      Is that under the Federal Motor

3   Carrier Safety Regulations?

4       A.      It's within those regulations, yes.

5       Q.      Why does the company follow that

6   requirement with regard to driver's daily log

7   and not any other requirements that we

8   discussed under the FMCSR?

9               MR. HORAN:  Note my objection to

10          that question.

11              You can answer it.

12      A.      To prevent fatigue.  They have a

13  certain amount of hours that they are allowed

14  to work or drive in a given 24-hour period and

15  it's done to monitor that.

16      Q.      How does T. and B. know that the

17  Federal Government requires them to keep these

18  logs?

19      A.      It's within the regulations.  I've

20  seen that section, the hours of service

21  requirements.

22      Q.      You've seen that section but you

23  haven't looked at other sections with regard to

24  safety?

25      A.      No, sir.

46

1                  M. Kelly

2     Q.    And I guess my question is, why does

3 the company comply with that one section when

4 it comes to driver's daily log?

5         MR. HORAN:  I think he already

6     answered it.

7     A.    To try to monitor their activity to

8 make sure that they are fit for duty.

9     Q.    Is that important to T. and B.?

10     A.    Very.

11     Q.    Why?

12     A.    I think that's obvious.

13     Q.    Not to me.  I need you to answer it.

14     A.    Okay.  I'm sorry.

15         MR. HORAN:  Don't be sorry.  It's

16     okay.  Answer his question.  It's okay,

17     you're doing fine.

18     Q.    You're doing very well.

19     A.    To hopefully avoid situations like

20 this particular situation.

21     Q.    So it's important for T. and B. to

22 have their drivers fresh and awake when they're

23 driving?

24     A.    Yes, very.

25     Q.    If a driver was driving for too long

47

M. Kelly

1

2    a period of time, a driver can possibly get

3    overtired, correct?

4        A.    Yes.

5        Q.    And if a driver is overtired, it

6    could cause them to lose their reactive --

7    withdrawn.

8              If a driver is overtired, it could

9    cause accidents, correct?

10             MR. HORAN:  Note my objection.

11             You can answer it.

12       A.    Yes, I would agree with that.

13       Q.    And T. and B. is concerned about

14   accidents?

15       A.    Yes.

16       Q.    Does the Federal Government require

17   you to produce these logs to them?

18       A.    If a driver --

19             MR. HORAN:  Yes or no.

20       A.    Yes.

21       Q.    And how is that done?

22       A.    Through DOT inspections along the

23   highway.

24       Q.    So in other words, while a truck

25   driver is driving, he could be pulled over to a

48

1                    M. Kelly

2    DOT inspection station?

3         A.    Yes.

4         Q.    And if he's at that inspection

5    station, he'd have to produce these logs?

6         A.    Yes.

7         Q.    And if he does not have these logs,

8    he'll be issued a ticket or summons, correct?

9         A.    Yes.

10        Q.    And the company has to pay that?

11        A.    The driver will pay that.

12        Q.    That comes out of the driver's pay?

13        A.    Yes.

14        Q.    Okay.  Does anyone at T. and B. oversee

15   the driver's daily logs?

16        A.    Yes.

17        Q.    Who is that?

18        A.    Ultimately me.

19               MR. HORAN:  I'm sorry, what did you

20        say?

21               THE WITNESS:  Me.

22        Q.    In 2006, how did you do that?

23        A.    Drivers will send in their logs via

24   Federal Express or UPS periodically, typically

25   every two weeks, to the office.

49

1                          M. Kelly

2        Q.      Are they provided with UPS envelopes?

3        A.      Yes.

4        Q.      So while they're on the road they'll

5   have to mail in these?

6        A.      Yes.

7        Q.      And where do they make copies, do

8   you know?

9        A.      Most all of their logbook should be

10  a -- is a two-piece carbon form and we get the

11  red copy, which is the original.

12       Q.      What do you do once you receive the

13  red copy of a driver's log?

14       A.      I have someone compile this miles

15  driven by states for fuel tax reporting purposes.

16       Q.      Somebody in your office?

17       A.      Yes.

18       Q.      For what purpose, I'm sorry?

19       A.      Fuel tax reporting.

20       Q.      For any other reason you do that?

21       A.      That's the only reason for this data

22  down here.

23       Q.      What else do you do with these daily

24  logs once you receive it?

25       A.      Their hours of service are compiled

50

1                           M. Kelly

2    into a spreadsheet.

3          Q.      By who?

4          A.      Usually the receptionist.

5          Q.      And who looks at that spreadsheet

6    once it's compiled?

7          A.      I do.

8          Q.      And what do you look for?

9          A.      I try to scan it periodically to

10   make sure that they are within the guideline

11   for hours of service.

12         Q.      And what are the hours of service

13   under the federal guidelines that a trucker is

14   allowed to drive?

15         A.      I could not quote you that regulation.

16   There's a plastic card that all of our drivers

17   have that has that printed on it.

18                 There's a 70 hour within six days

19   rule and an 80 hour within seven day rule and

20   then I think it's 11 hours of drive time in a

21   24-hour period.  I'm not certain of that rule.

22   I would need my reference.

23         Q.      Is it fair to say that what you do

24   is you have someone in your office compile the

25   hours that we just spoke about on a spreadsheet?

51

M. Kelly

1

2          A.      Uh-huh.

3          Q.      Yes or no?

4          A.      Yes.

5          Q.      Just for the record.

6          A.      Sorry.

7          Q.      That's okay.

8                  And then you take those hours, you

9    or someone that works for you, and compare it

10   to a formula?

11         A.      Yes.

12         Q.      Okay.  And that formula is consistent

13   with the guidelines set by the Federal

14   Government?

15         A.      Yes.

16         Q.      What happens if someone goes outside

17   of that formula?

18         A.      When I've seen that, I've spoken to

19   our operations staff, Nathan Hughes in

20   particular, and said you need to watch your

21   drivers, we've got issues with hours of service.

22         Q.      If a driver goes outside the hours

23   of service mandated by the federal guidelines,

24   would the company be subject to any potential

25   fines or violations?

52

M. Kelly

1

2       A.      Yes.

3       Q.      Can you describe for me what that is.

4       A.      The Department of Transportation, if

5   we were in an audit situation and they came in

6   and reviewed our books and records as they

7   relate to drivers and found these type of

8   violations and did not see any documented

9   disciplinary action, they could potentially

10  fine us.

11      Q.      So when you say documented

12  disciplinary action, what kind of disciplinary

13  action would that be?

14      A.      Written notice in -- written

15  documentation of counseling the driver that you

16  are exceeding your hours of service on these

17  days.

18      Q.      Prior to 2006, from the time that

19  you started with the company until July of

20  2006, had you had to sit down with a driver and

21  document --

22      A.      No, not me personally.

23              MR. HORAN:  Listen --

24      Q.      Let me finish the question.

25              MR. HORAN:  Let him finish.

53

1          M. Kelly

2          Just clarify.

3      Q.    The question is, have you had to sit

4   down with a driver and document any driver

5   going outside the federal requirements for

6   driving guidelines?

7      A.    No, I have not.

8      Q.    Do you know if anybody at T. and B.

9   had to during that period of time?

10     A.    I do not know.

11     Q.    Okay.

12          When you do a written disciplinary,

13   when you take written disciplinary action,

14   where does that go, does it go into his

15   personnel folder?

16     A.    Yes.

17     Q.    Where are the drivers' personnel

18   folders kept?

19     A.    They are kept by my payroll manager

20   in her office.

21     Q.    And that payroll manager reports

22   directly to you?

23     A.    Yes.

24     Q.    Was that the same situation in 2006?

25     A.    Yes.

54

1          M. Kelly

2      Q.    Okay.  Now, tell me what's inside of

3  a typical driver's personnel folder.

4      A.    Their initial application, a copy of

5  their DOT issued -- well, approved medical

6  card, and if there were any, if there were any

7  disciplinary action, those documents would be

8  in there, as well as I-9 form, copies of

9  identification.

10      Q.    What's an I-9 form?

11      A.    That's the immigration form to

12  basically prove you have the right to be in

13  this country and work.

14              (Kelly Exhibit 2, Document, marked

15          for identification, as of this date.)

16      Q.    I've handed you what's been marked

17  as Kelly 2.  Do you recognize this document,

18  Mr. Kelly?

19      A.    I don't believe I've seen this

20  before.

21      Q.    Are you familiar with the driver's

22  license and identification application, driver's

23  license and identification card application for

24  commercial driver Allen Rothenberger?

25      A.    No, I'm not.  I've never seen this

55

M. Kelly

1

2    particular item before.

3        Q.    Okay.  Do you know what year

4    Mr. Rothenberger obtained his commercial

5    driver's license?

6        A.    I'd have to go back and look at a

7    copy of the date issue on his license.

8        Q.    Okay.  This document was obtained by

9    us through a Freedom of Information Law request

10   actually just recently, and if you look at the

11   top of the driver's license, it says application

12   for driver's license that's checked; do you see

13   that?

14       A.    Yes.

15       Q.    Okay.  And if you come down a little

16   further, it's Allen Rothenberger?

17       A.    Yes.

18       Q.    And if you read the question where

19   it says driver license applicants complete the

20   following, do you see that?

21       A.    Yes.

22       Q.    And if you take a look at question

23   number 5, have you been convicted within the

24   past ten years in this state or elsewhere of

25   any offence resulting from your operation of or

LASER BOND FORM B  ®  PENGAD • 1-800-631-6989 • www.pengad.com

56

1                        M. Kelly

2     involving a motor vehicle, do you see that?

3         A.     Yes.

4         Q.     What did he check, yes or no?

5         A.     He's checked the no box.

6         Q.     If you turn to the second page of

7     this application, can you tell me what date --

8     first of all, do you recognize Mr. Rothenberger's

9     signature on the bottom of that page?

10        A.     Yes, that looks like his based off

11    of the logbooks.

12        Q.     Right, that's consistent with what's

13    in Plaintiff's 3 and 4?

14        A.     Uh-huh.

15        Q.     What date did he sign that?

16        A.     That appears to state 8/17, it looks

17    like '05.

18               (Kelly Exhibit 3, Driver history

19         record, marked for identification, as of

20         this date.)

21        Q.     Okay.  I hand you what's been marked

22    as Kelly 3.  What I've handed you is a Virginia

23    Department of Motor Vehicles transcript of a

24    driver history record as of June 17th, 2008; do

25    you see that?

57

M. Kelly

1

2      A.      Yes.

3      Q.      Have you ever obtained a copy of a

4  driver history record for any of the drivers at

5  T. and B. while you were working there?

6      A.      No.

7      Q.      Do you know how to obtain such a

8  driver transcript record?

9      A.      There is a form that I can get the

10  individual to sign giving me permission to do

11  that.

12      Q.      Why have you never done that?

13      A.      I don't know.

14      Q.      If you look at the top of the page,

15  it says requested for Kurzman, Karelsen & Frank;

16  do you see that?

17      A.      Uh-huh.

18      Q.      That's the name of my firm.

19      A.      Right.

20      Q.      Okay.  And if you come down, it's

21  information provided by request of Allen George

22  Rothenberger; do you see that?

23              Is that the driver who works for

24  your company?

25      A.      Yes.

58

1                    M. Kelly

2        Q.      If you look down at page 3, you'll

3    see on the last page it says convicted on

4    January 22nd, 1998 of driving while intoxicated

5    first degree?

6        A.      Uh-huh.

7        Q.      The offense date was 12/13/97; do

8    you see that?

9        A.      Yes.

10       Q.      Did you know prior -- did you know

11   when Mr. Rothenberger was hired that he had

12   been previously convicted of driving while

13   intoxicated?

14       A.      No, I did not.

15       Q.      Did you know that Mr. Rothenberger

16   was convicted twice of driving while intoxicated?

17       A.      No, I did not know that.

18       Q.      Did you know that he was convicted

19   of drunk and disorderly more than ten years

20   prior to employment with you?

21       A.      No, I did not know that.

22       Q.      If you do the math, 1998 to 2005, is

23   that within ten years?

24       A.      Yes.

25       Q.      Are you aware as you sit here today

59

M. Kelly

1

2   that Mr. Rothenberger lied on his driver's

3   application for his commercial driver's

4   license?

5            MR. HORAN:  Note my objection to the

6        form of the question.

7            You can answer it.  You can answer

8        it.

9        A.    Given this information, yes, it

10   would appear that he did.

11       Q.    Had you done any investigation to

12   find out if Mr. Rothenberger had been truthful

13   in his application for his commercial driver's

14   license?

15       A.    No.

16       Q.    Had you done any investigation on

17   any of your drivers to determine whether or not

18   they were truthful in their application in

19   obtaining their commercial driver's license?

20       A.    No.

21       Q.    Do you think it's important to have

22   done so?

23       A.    Yes.

24       Q.    Why didn't you do so?

25       A.    I don't have an answer for you.

60

1                    M. Kelly

2      Q.      If you look at Kelly 3 --

3      A.      Yes.

4      Q.      -- if you look at page 3 and you

5    look at the first paragraph on that page of

6    Mr. Rothenberger's history record, it says

7    convicted on July 13th, 2005 of operating an

8    uninsured vehicle; do you see that?

9      A.      It says uninspected.

10     Q.      Uninspected, I apologize. Uninspected

11   vehicle, do you see that?

12     A.      Yes.

13     Q.      Were you familiar that he was

14   convicted of that offense?

15     A.      No, I was not aware of it.

16     Q.      Was that done while he was employed

17   with T. and B.?

18     A.      I'd have to go look at his --

19              MR. HORAN:  Excuse me, I'm sorry.

20              Objection.  Do you mean a T. and B.

21       vehicle?

22              MR. TUCKER:  Well, I want to know

23       first if it happened while he was employed

24       with them and if --

25              MR. HORAN:  Okay.

68

1                              M. Kelly

2       your recollection about whether or not he was

3       driving for T. and B. in July of 2005?

4            A.    Yes, I'm pretty sure of that.

5            Q.    Okay.  If Mr. Rothenberger had been

6       convicted in July of 2005 for operating an

7       uninspected vehicle, would you have known about

8       that?

9            A.    If it were one of our vehicles, I

10      should have known.

11           Q.    If you look down in that paragraph

12      on the third page, it says commercial vehicle;

13      do you see that?

14           A.    Yes.

15           Q.    Do you know if he was driving any

16      other commercial vehicles during that period of

17      time other than a T. and B. vehicle?

18           A.    I do not know.

19           Q.    Between the time that Mr. Rothenberger

20      was hired and July of 2006, did anyone at

21      T. and B. take any steps to verify whether or

22      not he had committed any traffic offenses while

23      driving a T. and B. vehicle?

24           A.    To my knowledge, no.

25           Q.    Did you have any procedure in place

1                    M. Kelly

2     to do any checking on the drivers to make sure

3     that they were complying with all the rules and

4     regulations?

5          A.    No.

6          Q.    If you turn to page 2 of that

7     document --

8          A.    This one?

9          Q.    Kelly 3.

10         A.    Okay.

11         Q.    You'll see on the bottom it says

12    convicted on 6/19/06 --

13         A.    Uh-huh.

14         Q.    -- of operating an uninspected

15    vehicle; do you see that?

16         A.    Yes.

17         Q.    And the offense date for that was

18    May 31st, 2006; do you see that?

19         A.    Wait.  I'm sorry, I'm looking at the

20    wrong section.

21               Okay, 6/19.  Okay, I got you.

22         Q.    And you see the offense date was May

23    31st, 2006?

24         A.    Yes.

25         Q.    He was employed with your company at

70

1                          M. Kelly

2      that time?

3           A.      Yes, he was.

4           Q.      Are you aware that he was convicted

5      of this offense?

6           A.      No, I was not.

7           Q.      Is this the first time you've become

8      aware of this?

9           A.      Yes.

10          Q.      If you look at the next line below

11     that, it says suspension issued on July 11, 2006?

12          A.      Uh-huh.

13          Q.      And it's effective from July 4th, '06;

14     do you see that?

15          A.      Yes.

16          Q.      Do you know what that refers to?

17          A.      It looks like he didn't pay a ticket.

18          Q.      And if you see the conviction, the

19     conviction date is the same for the one above

20     for operating the uninspected vehicle in June 19,

21     2006; do you see that?

22          A.      Yes.

23          Q.      Do you know if his license was

24     suspended?

25          A.      I was not aware of this.

71

1                          M. Kelly

2        Q.     Okay.  And are you aware of the date

3    of the accident here?

4        A.     7/7/06.

5        Q.     Do you know if his license was

6    suspended at the time that he was involved in

7    this accident?

8        A.     No, I did not know that.

9              MR. TUCKER:  And while I'll concede,

10             John, that the next one I'm going to ask

11             about is after the accident date, I just

12             want it for informational purposes.

13             MR. HORAN:  Okay.  Thank you.

14             I'll just have a running objection to

15             anything post accident.

16             MR. TUCKER:  That's fine.

17       Q.     And you can answer the questions.

18   Just it's a technical issue that if I ask you

19   questions after the accident, it's something

20   that he can object to me bringing in at trial

21   but I'm entitled to inquire about it in

22   discovery, which we're doing now.

23       A.     Okay.

24       Q.     If you look above, you'll see on

25   August 16, 2007 Mr. Rothenberger was convicted

GE SANDERS REPORTING * (212) 594-5277

73

1            M. Kelly

2        A F T E R N O O N   S E S S I O N:

3            (12:52 p.m.)

4    M I C H A E L   A L L E N   K E L L Y,

5        previously sworn, resumed:

6    **EXAMINATION CONTINUED BY MR. TUCKER:**

7        Q.    Good afternoon, Mr. Kelly.  We're

8    back on the deposition.  You understand you're

9    still under oath?

10       A.    Yes.

11       Q.    Do you have any questions before we

12   begin?

13       A.    No.

14       Q.    I just have a couple of quick questions

15   just to go back to some of what we discussed

16   this morning.  You mentioned that

17   Mr. Rothenberger was paid by the mile --

18       A.    Yes.

19       Q.    -- and sometimes by the hour,

20   correct?

21       A.    Yes.

22       Q.    How much is he paid per each mile in

23   2006?

24       A.    I'd have to go look what his rate

25   was then.  I believe now it's 37 cents a mile.

74

1                      M. Kelly

2      Q.      And how about per hour?

3      A.      $10.

4      Q.      Is that what it is now, $10?

5      A.      I don't know.  I'd need to look that

6  up.

7      Q.      Do you know if it was less than $10

8  in 2006?

9      A.      I don't think so.

10      Q.      Do you know the specific date that

11  Mr. Rothenberger was hired, actually hired by

12  the company?

13      A.      I do not know.

14          MR. TUCKER:  I'm going to ask you to

15      produce that date and I'll put that request

16      in writing to Mr. Horan --

17          MR. HORAN:  Okay.

18          MR. TUCKER:  -- so we can just have

19      an answer for the exact date he was hired.

20          MR. HORAN:  Sure.

21          MR. TUCKER:  We have his

22      application.  We just don't know what the

23      date and time was.

24          MR. HORAN:  Do you think you have

25      some records at --

120

M. Kelly

1

2     Q.    And where is that physically kept,

3  in your office?

4     A.    It's in Ashland, yes.

5     Q.    In your office?

6     A.    In our office, yes, in Ashland.

7          MR. TUCKER:  Give me two minutes,

8  John.  I think I'm almost done.

9          MR. HORAN:  Okay.

10         (Recess taken.)

11 **BY MR. TUCKER:**

12    Q.    Mr. Kelly, do you know what a driver

13 qualification file is?

14    A.    Yes.

15    Q.    And what is that?

16    A.    It's a file that should contain some

17 documents mandated by DOT about the driver.

18    Q.    And how did you know that?

19    A.    Through research in the last

20 12 months.

21    Q.    Did you have a driver qualification

22 file for each of the drivers of T. and B. back

23 in 2006?

24    A.    No.

25    Q.    Did you have one for Mr. Rothenberger

LASER BOND FORM B  ⑧  PENGAD • 1-800-631-6989 • www.pengad.com